The PEOPLE of the State of Colorado,
Petitioner/Cross–Respondent

v.

Jeffery Allen LOVEALL,
Respondent/Cross–
Petitioner.

No. 08SC451.

Supreme Court of Colorado,
En Banc.

May 17, 2010.

John W. Suthers, Attorney General, Susan E. Friedman, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Petitioner/Cross–Respondent.

Douglas K. Wilson, Public Defender, Kathleen A. Lord, Chief Appellate Deputy Public Defender, Denver, Colorado, Attorneys for Respondent/Cross–Petitioner.

Justice RICE delivered the Opinion of the Court.

In this appeal, the People seek to reinstate the revocation of Jeffery Loveall's sex offender intensive supervision probation ("SOISP"). Loveall challenges this position and, on cross-petition, attacks the underlying convictions on which the SOISP and his subsequent incarceration are based. The court of appeals reversed the district court's revocation of Loveall's SOISP but rejected his collateral attacks. We affirm.

## I. Facts and Proceedings Below

This appeal concerns two convictions entered against Loveall: one count of enticement of a child, § 18–3–305, C.R.S. (2001), and one count of unlawful sexual contact, § 18–3–404(1)(a), C.R.S. (2001). Both convictions stem from the same sequence of events. Via a series of online exchanges taking place between April 4, 2001 and April 14, 2001, Loveall contacted "Sarah," an undercover police officer who identified herself as a fourteen-year-old girl, and made plans to have sex with her. When Loveall approached "Sarah" at the appointed time and place, he was arrested.

Initially, the People charged Loveall with one count of enticement of a child, a class-four felony, and one count of criminal attempt to commit sexual assault on a child, a class-five felony. Loveall, proceeding pro se, negotiated a plea agreement. In exchange for Loveall's guilty plea to the original enticement charge and a third count of unlawful

sexual contact, a class-one misdemeanor, the People agreed to drop the attempt charge and to seek a deferred judgment and sentence ("DJS") on the remaining felony. The prosecutor who negotiated the plea bargain informed Loveall that, were a conviction to enter on the enticement charge, he would be subject to a presumptive sentence of two years to life.

On January 14, 2002, Loveall executed a Rule 11 advisement, abandoning "all possible defenses to the charge[s]" and waiving his constitutional right to a jury trial and his right "to be represented by a lawyer in all stages of that trial." On April 1, 2002, the district court entered a four-year DJS for the enticement conviction and a four-year SOISP for the sexual contact conviction. Under the DJS, Loveall agreed to comply with all conditions established by the district court, including: (1) prohibition of contact with children under eighteen years of age,[1] (2) enrollment in and completion of offense-specific treatment, and (3) continued employment and payment of court fees. Additionally, the district court required that Loveall spend sixty days in the Douglas County jail.

Loveall's then-existing employment with the National Guard ended when he began serving the sixty-day prison term. After initially finding short-term employment with a temp agency, the agency discharged Loveall on September 26, 2002 after learning of his felony conviction. Loveall enrolled in a treatment program in Colorado Springs on August 13, 2002 but was terminated on December 16, 2002 for non-compliance.

Jane Ryan, Loveall's primary probation officer, petitioned the district court for revocation of Loveall's DJS, citing violations of the treatment and employment conditions. On March 13, 2003, the district court revoked the DJS and resentenced Loveall to a ten-year SOISP for the enticement charge, subject to the same conditions as the revoked

---

1. The terms of Loveall's DJS contained the following relevant provisions:

   4. You shall have no contact with any child under the age of eighteen (18), including your own children, nor attempt contact except under circumstances approved in advance and in writing by the probation officer in consultation with the community supervision team....

   5. If you have incidental contact with children, you will be civil and courteous to the child and immediately remove yourself from the situation....

DJS, and a four-year SOISP for the unlawful sexual contact charge. In addition, the district court required Loveall to return to the treatment program and to secure employment within forty-five days.

On June 3, 2003, Ryan reported that Loveall failed to obtain employment or return to treatment as directed. The district court assigned defense counsel to Loveall. At the revocation hearing on August 3, 2003, the district court reinstated the SOISP subject to the same conditions as before. The district court further ordered that Loveall be confined to the Douglas County jail for ninety days less time served.

On October 8, 2003, Loveall enrolled in a treatment program in Cañon City. At the time, Loveall's wife was pregnant. The treatment provider informed Loveall that any contact with children under the age of eighteen, *including his own children,* was prohibited under the stated conditions of his SOISP and the program's treatment contract. To help him prepare for the birth of his child, Loveall and the treatment provider composed a safety plan. In it, Loveall stated that "I will take [my wife] to hospital but not be in [the] birth area."

On January 5, 2004, Loveall took his wife to St. Thomas Moore Hospital, where his wife gave birth to their child. Shortly afterward, an unnamed probation officer discovered Loveall in the same room as his wife and child and reported this violation to Ryan. The Cañon City treatment provider learned of the violation and immediately terminated Loveall from its program.

A third revocation hearing took place on January 26, 2004. At the hearing, Ryan testified that an unnamed probation officer observed Loveall "in the hospital with his wife ... having contact with the baby." Ryan also testified that Loveall's courtesy probation officer in Cañon City, Suzanne Woodard, received a letter from Nurse Tiffany McCullough and a letter [2] and a phone call from Nurse Nancy Mann,[3] confirming Loveall's contact with the newborn. Loveall testified that he was only at the hospital so that he could make vital medical decisions regarding his child's health while his wife was under anesthesia following an emergency caesarian section. According to Loveall, he fell asleep in his wife's room, woke up to find both his wife and the baby present, and was discovered by the probation officer before he could remove himself from their presence.

At the revocation hearing, defense counsel objected to the prosecution's use of the letters as well as to Ryan's testimony regarding the phone conversation between Woodard and Mann. Defense counsel argued that, because the prosecutor did not give him a copy of the letters or otherwise provide the nurses' names until shortly before the revocation hearing, Loveall was denied a reasonable opportunity to cross-examine them.[4] The court initially excluded both letters, holding that Loveall must be given "a reasonable opportunity to confront" even in the context of a probation revocation hearing, but admitted the testimony regarding Mann's telephone call. On cross-examination, defense counsel questioned Ryan about Mann's tele-

2. In pertinent part:
   On January 5, 2004, at approximately 10:00 am a man came to the OB Unit and pushed the intercom button for admission to the OB restricted unit. The man requested to come in and visit with patient Nancy Loveall in room 240. He was allowed in and proceeded to room 240 where he was asked to wait while the nurses were busy with the patient.
   The man was walking back and forth and leaning against the wall for a period of time when I asked if I could help him with something. *He responded, "I'm here to visit my wife and baby, but I have to wait". [sic] I replied okay and then contacted Michelle Chess with the Department of Human Services.*
   (Emphasis added).

3. During her testimony, Ryan read from Woodard's written narrative dated January 5, 2004 regarding Mann's phone call:

   I called the nursery at St. Thomas Moore Hospital and spoke to Nurse Nancy Mann, the nurse in charge of the nursery. *The defendant was there at 3:20 p.m. holding the baby.* The nurse also stated he was there last night when the baby was born.
   (Emphasis added).

4. The prosecutor answered that, although Ryan received the letters on January 14, 2004, he was not informed of the letters' existence until the day of the hearing.

phone allegations.[5] Toward this end, defense counsel attempted to impeach Ryan's testimony—specifically, Mann's statement that she observed Loveall holding the baby—using Mann's letter. The district court informed defense counsel that he could only use the letter if it was admitted into evidence. Defense counsel agreed to admit the letter for this purpose.

Based on Ryan's testimony, the district court determined that Loveall had violated three conditions of his probation: (1) he had contact with his child at the hospital, (2) he was terminated from sex-offender treatment for breach of the treatment contract, and (3) he failed to find employment. The district court revoked the ten-year SOISP for enticement and resentenced Loveall to a correctional facility for two years to life with credit for time served.[6]

Loveall appealed the revocation of the ten-year SOISP. The court of appeals, having rejected Loveall's attacks on the underlying convictions, held that the district court's admission of hearsay statements without good cause or advance disclosure of the declarants' identities violated Loveall's right to due process. Because the district court improperly relied on hearsay evidence to conclude that Loveall violated the no contact and treatment conditions of his SOISP and because it was unclear whether the district court would have revoked Loveall's SOISP based on his unemployment alone, the court of appeals reversed the revocation and remanded the case to the district court for a new hearing.

## II. Issues on Cross–Petition

On cross-petition, Loveall mounts two collateral attacks regarding the validity of his original guilty plea and resulting DJS. Because the issues raised in the People's petition presuppose that the guilty plea and DJS were valid, we consider the issues raised on cross-petition first.

### A. Pro Se Defendant's Ability to Enter a DJS

■ Loveall argues that his plea of guilty to the enticement charge is void for lack of jurisdiction because a court may order a DJS only if the defendant is represented by legal counsel. § 18–1.3–102, C.R.S. (2009). To succeed, Loveall must circumvent the three-year statute of limitations for collateral attacks, § 16–5–402(1), C.R.S. (2009), by treading an alternate path, § 16–5–402(2)(a) (describing the subject matter jurisdiction exception). We deny him passage.

■ We have held that a district court has jurisdiction if "the case is one of the type of cases that the court has been empowered to entertain by the sovereign from which the court derives its authority." *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 513 (Colo.1986). The Colorado Constitution provides that district courts, as the trial courts of general jurisdiction, possess original, state-wide jurisdiction in all criminal cases. Colo. Const. art. VI, § 9(1). Of course, the courts' otherwise "unrestricted and sweeping jurisdictional powers" remain subject to legislative restraints and enactments. *In re A.W.,* 637 P.2d 366, 373 (Colo. 1981). Accordingly, we have held that a district court exceeds its jurisdiction when it acts without general jurisdiction "but also when it acts with general jurisdiction but contrary to statute." *People v. Carbajal,* 198 P.3d 102, 105 (Colo.2008); *People v. Simonds,* 113 P.3d 762, 763 (Colo.2005) (holding district court did not exceed its jurisdiction by revoking DJS where application seeking revocation was filed within time permitted by statute). In this respect, our longstanding practice has been to avoid interpreting statutory language as a limit on a court's power "unless the limitation is explicit." *In re Estate of Ongaro,* 998 P.2d 1097, 1103 (Colo.

---

5. The exchange included the following colloquy:
   Q: [According to Woodard's narrative, w]ho saw [Loveall] holding the baby?
   A: It appears to be Nurse Mann, Nancy Mann....
   Q: Okay. Now, the previous exhibit [the prosecutor] tried to have admitted is a letter from Ms. Mann, correct?
   A: Correct.
   ....
   Q: At no time in her letter did she indicate Mr. Loveall held the baby.
   A: No.

6. The court discharged the four-year SOISP for unlawful sexual contact for time served.

2000) (quoting *In re A.W.*, 637 P.2d at 374). Where the statute contains explicit limiting language, we consider "whether or to what extent the legislature could divest the district courts of jurisdiction." *In re Estate of Ongaro*, 998 P.2d at 1103.

We apply this analytic framework to section 18–1.3–102. Subsection (1) reads,

> In any case in which the defendant has entered a plea of guilty, the court accepting the plea has the power, *with the written consent of the defendant and his or her attorney of record and the district attorney,* to continue the case for a period not to exceed four years of the date of entry of a plea to a felony. . . .

(Emphasis added). Subsection (2) uses similar language,

> Prior to entry of a plea of guilty to be followed by a[DJS], the district attorney . . . is authorized to enter into a written stipulation, *to be signed by the defendant, the defendant's attorney of record, and the district attorney,* under which the defendant is obligated to adhere to such stipulation.

(Emphasis added). We conclude that neither subsection expressly limits the district court's power to entertain a category of cases. *See Adams*, 718 P.2d at 513; *In re Estate of Ongaro*, 998 P.2d at 1103. Rather, they merely underscore the fact that a DJS, in the first instance, requires the written consent of the parties and their counsel of record. § 18–1.3–102(2). While it is true that the district court cannot enter a DJS without a duly-signed stipulation, its inability to act is not due to a lack of jurisdiction but to the fact that, without a signed stipulation, there is literally nothing upon which the court may act.[7]

Because the written authorization requirement set forth in section 18–1.3–102 is not jurisdictional in nature, we hold that Loveall's collateral attack is untimely. *See* § 16–5–402.

## B. Viability of DJS Under Section 18–1.3–1004

Loveall also argues that the DJS is void for lack of jurisdiction because a DJS is not available for sex offenses under the Lifetime Supervision of Sex Offenders Act. § 18–1.3–1001, et seq., C.R.S. (2009). We hold that this attack also runs afoul of section 16–5–402.

The Act requires district courts to "sentence a sex offender to the custody of the [department of corrections] for an indeterminate term of at least the minimum of the presumptive range . . . and a maximum of the sex offender's natural life." § 18–1.3–1004(1)(a); *see also* § 18–1.3–1003(5)(a)(VII) (applying the Act to the crime of enticement). We conclude that the statutory language expressly limits the district court's jurisdiction only in those cases where the district court actually enters a sentence. § 18–1.3–1004(1)(a); *In re Estate of Ongaro*, 998 P.2d at 1103. However, "[a] deferred judgment is technically not a sentence; it is a continuance with probation-like supervision conditions." *Carbajal*, 198 P.3d at 106 (citing § 18–1.3–102). In fact, the enticement statute allows for the possibility of a DJS. "When a person is convicted, pleads nolo contendere, or *receives a deferred sentence* for a violation of the provisions of this section and the court knows the person is a current or former employee of a school district . . . the court shall report such fact . . . ." § 18–3–305(3) (emphasis added). Moreover, we have upheld the use of a DJS in other sex offense cases subject to the Act. *See, e.g., Carbajal*, 198 P.3d at 104 (upholding DJS for sexual assault); *Simonds*, 113 P.3d at 763 (Colo. 2005) (upholding DJS for sexual assault on a child).

Given the clear instruction provided both by the statutory scheme and the prior decisions of this court, we hold that the district court did not exceed its jurisdiction by entering a DJS in this case. Accordingly, Loveall's collateral attack is barred under the three-year statute of limitations set forth in section 16–5–402.

---

7. In this respect, our holding is consistent with that we announced in *Carbajal*, 198 P.3d at 105–06. There, we examined seven "statutory limits" placed on the district court's jurisdiction by the DJS statute. *Id.* We did not count the written consent requirement among them. *Id.*

### III. Issues on Petition

Next, we turn to those issues presented for our review by the People. The People first argue that their use of hearsay evidence to prove alleged violations of Loveall's SOISP was proper under the circumstances. Second, the People argue that, were we to find their use of hearsay evidence was improper, the remaining, non-hearsay evidence was sufficient to support revocation.

### A. Use of Hearsay Evidence

■ We begin by considering whether the People's use of hearsay evidence, undertaken by the People without timely providing Loveall with the names of the declarants, constitutes a denial of his constitutional right to due process. Under the facts here presented, we hold that it does.

In *Morrissey v. Brewer*, the U.S. Supreme Court determined that "the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations." 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *see also Gagnon v. Scarpelli*, 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (extending *Morrissey* holding to probation revocation hearings). The lower standard for due process available in revocation hearings was justified, according to the Court, by the State's "overwhelming interest" in returning an individual to prison without the burden and associated costs of mounting a new criminal trial, provided there was sufficient evidence that the individual failed to abide by the conditions of his probation. *Morrissey*, 408 U.S. at 483, 92 S.Ct. 2593.

The *Morrissey* Court avoided creating a code of procedure for revocation hearings. *Id.* at 488, 92 S.Ct. 2593 ("We cannot write a code of procedure; that is the responsibility of each State."). Instead, the Court set forth the minimum requirements such proceedings must follow to comply with due process. *Id.* at 488–89, 92 S.Ct. 2593. Among the rights afforded probationers is that "to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id.* at 489, 92 S.Ct. 2593. Soon after *Morrissey*

was announced, the General Assembly answered the Court's call, establishing the procedure required for revocation hearings in Colorado. *See* § 16–11–206, C.R.S. (2009). In Colorado, the prosecution can admit hearsay evidence at a revocation hearing provided "the defendant is accorded a fair opportunity to rebut hearsay evidence." § 16–11–206(3). Since section 16–11–206(3) was enacted, the court of appeals has attempted to clarify what a "fair opportunity to rebut hearsay" entails.

Loveall cites two of these cases, *People in Interest of T.M.H.*, 821 P.2d 895 (Colo.App. 1991), and *People v. Thomas*, 42 Colo.App. 441, 599 P.2d 957 (1979), to argue that he was entitled to greater due process. In *T.M.H.*, the court of appeals held that, where the prosecutor is unable to produce any corroborating documentary evidence and "the only witness lacks personal knowledge of the essential incriminating facts," the probationer is not provided a fair opportunity to rebut hearsay testimony. 821 P.2d at 896–97. Similarly, in *Thomas*, the court of appeals held that hearsay evidence presented via a probation officer's testimony does not provide a fair opportunity to rebut even where the probationer stands ready to take the stand and deny the accusation. 599 P.2d at 958.

We find these cases distinguishable. The violations of probation alleged by the prosecution in *T.M.H.* and *Thomas* were additional criminal acts allegedly perpetrated by the probationers. *T.M.H.*, 821 P.2d at 895–96; *Thomas*, 599 P.2d at 957–58. As such, they are not subject to the preponderance of evidence standard, which is applicable here, but to the more stringent, beyond a reasonable doubt standard. § 16–11–206(3); *see also People v. Kelly*, 919 P.2d 866, 868 (Colo.App. 1996) (applying similar analysis to distinguish *Thomas* and *T.M.H.*). Nor do we find it necessary to determine whether a probation officer's testimony, based solely on hearsay evidence, can ever establish a violation of probation beyond a reasonable doubt.

■ Rather, we find it sufficient to hold that hearsay evidence may be used to establish a probation violation other than an al-

leged crime provided minimum due process requirements are met.[8] On multiple occasions, the court of appeals wrestled with the due process requirements set forth by the *Morrissey* Court and the General Assembly.[9] From this line of cases, we discern a workable standard: where revocation is based on a violation other than an alleged crime, "the defendant's due process right is satisfied by subjecting the probation officer to cross-examination about proffered hearsay and affording the [probationer] an opportunity to present witnesses and testify in his or her own behalf." *Manzanares*, 85 P.3d at 610. However, the impact of these techniques is greatly diminished—if not eradicated entirely—where the defendant is given little or no opportunity to test the accuracy of the hearsay evidence or the credibility of the declarants from whom it was gleaned. *See Singletary v. Reilly*, 452 F.3d 868, 874–75 (D.C.Cir. 2006) (ordering new parole revocation hearing where declarants of hearsay evidence relied upon by prosecution were never cross-examined "nor were their identities even revealed for purposes of evaluating their credibility").

8. We recognize that other jurisdictions require that a finding of good cause be made before hearsay evidence is used at a revocation hearing. *See, e.g., People v. Winson*, 29 Cal.3d 711, 175 Cal.Rptr. 621, 631 P.2d 55, 58 (1981). We decline to adopt a similar rule. Rather, we find that the better approach is to determine the "requirements of due process [based] on the circumstances of each case and an analysis of the various interests at stake." *Commonwealth v. Durling*, 407 Mass. 108, 551 N.E.2d 1193, 1196 (1990).

9. *See, e.g., People v. Turley*, 109 P.3d 1025, 1026 (Colo.App.2005) (holding hearsay testimony proper where probationer had fair opportunity to rebut hearsay testimony and cross-examine the witness who introduced it); *People v. Manzanares*, 85 P.3d 604, 610 (Colo.App.2003) (holding use of hearsay evidence did not offend due process where probationer could cross-examine testifying probation officer, present witnesses, or testify on his own behalf); *People v. Moses*, 64 P.3d 904, 908 (Colo.App.2002) (holding hearsay testimony proper where offering witness was subject to cross-examination and the lab reports corroborating the hearsay testimony were readily available); *People v. McCoy*, 939 P.2d 537, 541 (Colo.App.1997) (holding revocation based solely on hearsay evidence met due process requirements where probationer had opportunity to cross-examine the witnesses and to rebut the evidence through her own testimony); and *Kelly*,

Here, the prosecution failed to provide Loveall's defense counsel the nurses' letters, Woodard's narrative describing her phone conversation with Mann, or any other document containing the nurses' names until shortly before the probation revocation hearing. The trial court sustained Loveall's initial objection as to the letters, holding that the prosecution denied Loveall a reasonable opportunity to cross-examine the nurses, but admitted Woodard's narrative regarding the phone conversation without regard for its late disclosure. The trial court then went on to hold that defense counsel could not use Mann's letter to impeach Woodard's narrative without first admitting the letter into evidence in its entirety.[10] In so deciding, the trial court presented Loveall's defense counsel with a Hobson's choice: either to admit Mann's letter into evidence in order to impeach the narrative, which stated only that Loveall was present at the hospital, or to proceed without admitting the letter only to leave Woodard's narrative, which contained Mann's highly damaging accusation that Loveall actually held the baby, unchallenged.[11]

919 P.2d at 868 (holding probationer had fair opportunity to rebut probation officer's hearsay testimony where probationer had opportunity to cross-examine officer, testify on his own behalf, and present witnesses and where probationer admitted at his resentencing hearing that he had violated a condition of his probation).

10. The trial court could have chosen to allow defense counsel to impeach Woodard's narrative using Mann's letter without the letter being admitted into evidence. CRE 612.

11. Defense counsel's strategy in admitting Mann's letter is apparent in his argument to the court regarding the admissibility of McCullough's letter,

> I didn't want to bring in [Mann's] letter but ... I have strong concerns because the letter doesn't indicate my client was in the same room let alone holding the baby. This is notarized versus what's a telephone conversation with a third party that this witness is testifying to.
> ....
> The reason I brought in [Mann's letter] is to impeach the [telephone] statement that stands on [its] own that we don't have a chance to cross-examine so I have to impeach it through a piece of evidence not normally admissible.

And in his closing argument to the trial court,

Under these circumstances, we do not find that defense counsel's decision to admit Mann's letter into evidence prevents him from later raising a due process claim.

Thus, we hold that, under the facts of this case, the prosecutor's decision to withhold the names of the declarants until shortly before the hearing prevented Loveall from receiving the minimum due process rights owed him.

## B. Existence of Sufficient, Independent Grounds for Revocation

■ Next, we consider whether the court of appeals erred by reversing the revocation despite the existence of additional, non-hearsay evidence demonstrating that Loveall violated a condition of his SOISP. We hold that reversal was proper under the circumstances.

Where one or more bases for revoking probation are set aside on appeal, the revocation remains valid provided at least one violation is sustained. *See People v. Howell,* 64 P.3d 894, 897 (Colo.App.2002) (upholding revocation after finding that evidence independent of hearsay testimony given by probation officer supported revocation of SOISP); *cf. People v. Broga,* 750 P.2d 59, 62 (Colo.1988) (upholding aggravated sentence, reasoning that "[w]here the sentencing court finds several factors justifying a sentence in the aggravated range, only one of those factors need be legitimate to support the sentencing court's decision"). Thus, it is undeniably true that any single probation violation could justify a district court's decision to revoke; however, it is substantially less clear whether the probation officer *would* exercise his or her discretion to seek revocation—or, for that matter, whether the district court would remain willing to revoke—based solely on the remaining violation. *See State v. Ojeda,* 159 Ariz. 560, 769 P.2d 1006, 1007 (1989).

> With respect to contact with children, I would differ. [Loveall] indicated he did not have contact with his child. The complaint says he was seen holding the baby. Everyone indicated there was no time he ever held the baby including [Mann's letter], the letter also indicates he was just in the hall.

12. Other appellate courts either explicitly adopted the *Ojeda* rule or applied substantially

The Arizona Supreme Court acknowledged the infirmities inherent in the rigid approach espoused by the People.

> The [rigid rule], although supportable in a purely technical sense, ignores the realities of the probation process. If some of the alleged violations do not hold up on appeal and the revocation is affirmed without remand, a significant chance exists that the defendant's probation may be revoked for a violation that, by itself, would not have caused the probation officer to petition for revocation or the judge to revoke.

*Id.* The *Ojeda* court recognized that, when a probation officer petitions for revocation, he or she generally will include every alleged violation, whether "serious" or merely "technical." *Id.* Where a serious violation falls through, the probation officer is left only with technical violations that he or she may have decided against presenting separately. *Id.* Thus, the *Ojeda* court reasoned: "We should affirm without remand only where the record clearly shows the trial court would have reached the same result even without consideration of the improper factors." *Id.* at 1008.[12] We adopt the *Ojeda* rule and apply it here.

Loveall admitted that he was unemployed at the time of the revocation hearing. Thus, while it is clear that Loveall violated the conditions of his SOISP by failing to secure employment, it is substantially less clear whether Ryan would have petitioned for revocation based on the unemployment violation alone. Ryan petitioned for revocation three times. Each petition included allegations that Loveall violated the conditions of his SOISP by failing to secure employment, enroll in an offense-specific treatment program, and, on the final occasion, avoid contact with children. The filing of all three petitions corresponded with his termination from treatment—not the deadline imposed for

similar rules. *See, e.g., State v. Street,* 28 Kan. App.2d 291, 16 P.3d 333, 335 (2000) (adopting *Ojeda* rule); *Mann v. State,* 285 Ga.App. 39, 645 S.E.2d 573, 577 (2007) (applying substantially similar rule); *Shepard v. State,* 939 So.2d 311, 315 (Fla.App.2006) (same); *Brundridge v. Bd. of Parole and Post Prison Supervision,* 192 Or.App. 648, 87 P.3d 703, 707 (2004) (same).

finding employment. On cross-examination, Ryan described a conversation she had with Loveall's courtesy probation officer regarding his probation.

Q: Did [the probation officer] ever say she was going to revoke his probation for not finding a job?

A: She expressed concern to me about it, yes, because it was part of the court order when he was reinstated to probation that he find employment.

Q: Right. But she also indicated he was seeking employment but found none in Cañon City.

A: Correct.

Q: Based on that, she wanted him to expand his search.

A: Correct.

Q: Never did say to you though that he had not tried to find a job.

A: No.

Q: Even though he was unemployed, he was current in his fees, costs, and restitution; is that correct?

A: That's correct.

Based on the foregoing, we are unable to conclude that "the record clearly shows the trial court would have reached the same result even without consideration of the improper factors." *Ojeda,* 769 P.2d at 1008.

Accordingly, we hold that the prosecutor's decision to withhold the names of the declarants until shortly before trial failed to accord Loveall the minimum due process rights owed him under *Morrissey.* Therefore, we affirm the court of appeals' judgment below and remand to the court of appeals with instructions to remand to the district court for a new hearing[13] to be conducted consistent with this opinion.

Justice COATS concurs in part and dissents in part.

Justice EID concurs in part and dissents in part.

Justice COATS, concurring in part and dissenting in part.

Although the majority ultimately finds a due process violation in the probation revocation proceedings below, I believe it substantially misapprehends the nature and scope of a probationer's right to confront and cross-examine witnesses against him, as well as the scope of section 16–11–206(3), C.R.S. (2009), which affords probationers a fair opportunity to rebut hearsay evidence under certain circumstances. Significantly, I believe, this misapprehension leads the majority to articulate a rule permitting the unbridled use of hearsay evidence in revocation proceedings, at least where the proof of an additional crime is not involved and the hearsay declarants' names have not been withheld by the prosecution, that I consider to be irreconcilable with the applicable jurisprudence of the United States Supreme Court. Because I believe that the Due Process Clause guarantees a probationer the right of confrontation in the absence of a finding of good cause to deprive him of that right and because I believe the statutory guarantee of a fair opportunity to rebut hearsay in this jurisdiction is limited by its own terms to the admission of evidence violating a constitutional exclusionary rule, I concur only in the majority's decision to order a new revocation hearing but not in its directions for the conduct of that hearing.

In *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), the Supreme Court made clear that probation is not a privilege that can be revoked without compliance with due process of law. Although the full panoply of rights due a defendant in a criminal prosecution does not apply to the revocation of probation, the Court enumerated certain minimum requirements of due process in this context, to include "the right to confront and cross-examine adverse witnesses (*unless the*

---

**13.** Our ordinary practice is to remand to the trial court for further findings. We deem a new hearing to be necessary here, as the district court judge who presided over the revocation proceedings below has retired. *See People v. Harmon,* 3 P.3d 480, 485 (Colo.App.2000) ("Ordinarily, we would remand for further findings by the trial court. However, because the judge who revoked defendant's probation has resigned, we cannot remand for clarification of the trial court's reasons for revoking defendant's probation. Therefore, a new hearing is necessary.").

*hearing officer specifically finds good cause for not allowing confrontation* )." *Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593 (emphasis added). I consider this language to be a clear and unmistakable reference to the Sixth Amendment confrontation right, of which a defendant can be deprived, even in this context, only by a specific finding of good cause.

The Supreme Court's thinking about the Confrontation Clause has undergone considerable metamorphosis since *Morrissey* and *Gagnon,* but its limited applicability to probation revocation proceedings has never been overruled. *See United States v. Hatter,* 532 U.S. 557, 567, 121 S.Ct. 1782, 149 L.Ed.2d 820 (2001) ("[I]t is this Court's prerogative alone to overrule one of its precedents" (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 20, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997))). Rather than expressing a concern for the reliability of evidence in general, the Confrontation Clause is now understood to apply only to testimonial evidence, *see Whorton v. Bockting,* 549 U.S. 406, 413–14, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) and, when applicable, to require an actual opportunity to confront, *see Crawford v. Washington,* 541 U.S. 36, 68–69, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Despite *Morrissey* 's expressed intention that the revocation process remain "flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial," 408 U.S. at 489, 92 S.Ct. 2593, and its failure to define or impose any particularly onerous limitations on a finding of "good cause," it is nevertheless indisputably the case that a probationer can (consistent with due process) be deprived of the opportunity to confront and cross-examine the declarant of testimonial evidence only upon a specific finding of good cause to do so.

Section 16–11–206(3) acknowledges that probation may be revoked for the commission of a crime not involving conduct specifically prohibited as a condition of that probation, as long as the probationer has been convicted in a separate criminal proceeding or the People prove its commission beyond a reasonable doubt. This heightened burden is not required as a matter of due process and apparently reflects a legislative appreciation that unlike the violation of an enumerated condition of probation, which need only be proved by a preponderance of the evidence, actual conviction of such an unspecified crime would require proof beyond a reasonable doubt. Nothing in this legislative distinction, however, in any way justifies diminishing a probationer's constitutional right to confront and cross-examine a declarant of testimonial evidence that is relevant to establishing the violation of a specific condition of probation rather than an unspecified crime. The confrontation right described in *Morrissey* applies no less when revocation is permitted upon proof by a preponderance of evidence than when it requires proof beyond a reasonable doubt.

To the extent the majority intends that the good cause requirement of *Morrissey* is automatically satisfied by notifying a probationer well in advance of the revocation hearing of the names of hearsay declarants and permitting the probationer to cross-examine the testifying witnesses lacking first-hand knowledge and present witnesses of his own, its holding flies in the face of the express language of *Morrissey.* Whatever justification may ultimately be held sufficient in any particular set of circumstances, "good cause for not allowing confrontation" clearly implies something about the availability of the witness, not simply that other means of testing the reliability of the evidence may be considered adequate. *See Crawford,* 541 U.S. at 55–56, 124 S.Ct. 1354 (right of confrontation guarantees a particular method of ensuring reliability rather than reliability itself). In any event, *Morrissey* demands a specific finding by the hearing officer, which was not made in this case. If anything, the majority's disclosure discussion addresses an additional due process requirement imposed by *Morrissey* and *Gagnon,* and there is no indication in those cases that complying with that requirement could serve as a substitute for the right of confrontation. *See Morrissey,* 408 U.S. at 489, 92 S.Ct. 2593.

To the extent the majority suggests, as argued by the defendant and apparently accepted by the intermediate appellate court, that section 16–11–206(3) actually imposes an additional or separate requirement that the

defendant must be accorded a fair opportunity to rebut hearsay evidence, I believe such a suggestion can only result from a misreading of the statute. The single sentence upon which this construction is based expressly addresses the admission of evidence that would be excluded from a criminal trial because it was acquired in violation of the defendant's constitutional rights. This provision was clearly added to the statute to emphasize that this jurisdiction would not countermand the Supreme Court's determination that constitutional exclusionary rules of evidence do not apply to probation revocation hearings but at the same time to ensure that any such evidence may nevertheless be admitted only if it has probative value and, if offered through hearsay testimony, as will often be the case, that the defendant is accorded a fair opportunity to rebut that testimony. This limited language in no way suggests a broad rule of discovery for probation revocation proceedings or any additional protection against the use of hearsay testimony generally.

Finally, I am concerned by the majority's reference to "the prosecutor's decision to withhold the names of the declarants until shortly before trial." Maj. op. at 417. I believe the record supports, at most, the assertion that the probation department had copies of the subject letters in its file for several weeks before the hearing and that they were never affirmatively brought to the attention of the defendant or his attorney until the hearing. I would reject any requirement, whether the majority considers it to be based on constitution or statute, that in addition to, or as an integral part of, *Morrissey*'s required finding of good cause, the prosecuting officer must affirmatively notify the probationer, sometime well before the hearing, of the names of anyone whose hearsay the prosecution intends to offer.

Because I agree that the district court did not lack subject matter jurisdiction over the probationer's conviction or sentence and that it cannot be determined that the district court would have resentenced the defendant as it did but for erroneously depriving him of his right of confrontation, I would affirm the court of appeals remand order.

I therefore concur in part and dissent in part.

Justice EID, concurring in part and dissenting in part.

In concluding that Loveall violated the "no contact with any child" condition of his probation,[14] the trial court relied on a notarized letter from a nurse who stated that she saw Loveall at the door of his wife's hospital room and that he told her he was waiting to see his wife and baby. The U.S. Supreme Court has expressly permitted the admission of such letters at probation hearings where "good cause" is shown. Here, the "good cause" standard is satisfied because the notarized letter was sufficiently reliable and because Loveall never denied or otherwise challenged the nurse's description of the incident. Accordingly, I respectfully dissent from that portion of the majority's opinion finding that Loveall's due process rights were violated at his probation revocation hearing.

There is no dispute that Loveall was in his wife's hospital room at the same time the baby was in the room; Loveall, his wife, and his wife's grandmother all testified to that fact.[15] There is also no dispute that, according to his own testimony, Loveall knew that he was not to be in the room with the baby.[16] The only question was whether Loveall knowingly placed himself in a situation where prohibited contact with the baby would occur.

As to that issue, Loveall testified that he had fallen asleep in his wife's room and

14. Although Loveall challenged the validity of this condition before the court of appeals, he did not renew that issue before us, and as the majority does not address it, nor do I.

15. The prosecution asked Loveall's wife: "You and your husband and the baby [were] all present [in the room]?" Loveall's wife answered, "Yes." The wife's grandmother testified that she and Loveall "went back that afternoon and visit-

ed with [Loveall's wife] and they brought the baby in." Loveall testified that he was sitting in a chair in the room and fell asleep, and that when he awoke the baby was present.

16. The prosecutor asked: "So you knew you were not to be in the room with the child." Loveall answered, "Yes."

awakened to find the baby present. *See* maj. op. at 411. The trial court, however, rejected Loveall's "accidental" contact theory. Specifically, the court concluded that Loveall "clearly had contact with the child when he was in the room and he knew he shouldn't have and he was aware of the violation...." The court pointed to Exhibit 4, a notarized letter from Nancy Mann, a nurse at the hospital. In the letter, Mann stated that she saw Loveall outside his wife's room and asked him if she could help him with anything, and he responded: "I'm here to visit my wife *and baby*, but I have to wait." (Emphasis added.) The court concluded from this statement that Loveall "was clearly there [outside his wife's room] to visit the baby. It was not contradicted he did in fact make that statement." Importantly, while the majority does not consider the trial court's actual findings, it is clear that the Mann letter was the only hearsay evidence the court relied upon to reach the conclusion that Loveall violated the "no contact" condition.[17]

The U.S. Supreme Court has held that evidence admitted at a probation hearing need not meet the evidentiary requirements of a criminal trial. According to the Court, "the process [for probation revocation] should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole); *Gagnon v. Scarpelli*, 411 U.S. 778, 782 & n. 5, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (adopting *Morrissey* in probation context). Under *Morrissey* and *Gagnon*, due process requires that the defendant have "the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)[.]" *Morrissey*, 408 U.S. at 489, 92 S.Ct. 2593.[18] This "good cause" requirement is satisfied when the hearsay evidence in question—here, the notarized Mann letter—is deemed sufficiently reliable. *See, e.g., United States v. Kelley*, 446 F.3d 688, 692–93 (7th Cir.2006); *Kell v. U.S. Parole Comm'n*, 26 F.3d 1016, 1020 (10th Cir.1994); *Reyes v. State*, 868 N.E.2d 438, 441–43 (Ind.2007); *Harris v. United States*, 612 A.2d 198, 201–02 (D.C.1992).[19]

As applied in this case, the trial court did not err in considering the Mann letter because it was sufficiently reliable. As was established at the hearing, the letter was notarized. While Loveall objected to the letter on the ground that it was hearsay, he did not give any reason to conclude that the letter was of questionable reliability. In fact, when Loveall's counsel sought to contradict the testimony of Loveall's probation officer that Mann saw Loveall holding the baby, he pointed to the fact that the statements in the letter were more reliable than the probation officer's recounting of the conversation because the letter was notarized. And while the majority may be correct that Loveall's use of the letter to support his case does not, as a technical matter, waive his due process objection, maj. op. at 415–16, his use of the letter does demonstrate the fact that he considered the statements in the letter to be reliable. Most importantly, as the trial court pointed out, Loveall never denied making the

17. Like the majority, the court of appeals failed to differentiate the Mann letter, which the trial court expressly relied upon, from other hearsay evidence presented at the hearing. *See People v. Loveall*, 203 P.3d 540, 546 (Colo.App.2008) (concluding that "[w]ithout *the hearsay evidence*, the trial court could not have found that Loveall knowingly violated the 'no contact' condition" (emphasis added)).

18. The right of a probationer to confront witnesses against him is rooted in the Due Process Clause, not the Sixth Amendment right of confrontation, because the Sixth Amendment right is limited to criminal prosecutions. *See United States v. Kelley*, 446 F.3d 688, 691 (7th Cir.2006) (rejecting defendant's argument that *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), overruled *Morrissey* and *Gagnon* and finding that any right to confront witnesses at a probation hearing is rooted in due process, not the Sixth Amendment right to confront witnesses in a criminal trial).

19. I agree with Justice Coats that section 16–11–206(3)'s reference to "a fair opportunity to rebut hearsay evidence" refers only to the "exclusionary rules of evidence"—that is, constitutional exclusionary rules. Conc. & dis. op. at 419 (citing § 16–11–206(3), C.R.S. (2009)). The statute therefore does not impose an independent basis for challenging the use of hearsay evidence in probation hearings. *Id.* at 418–19.

statement to Mann or otherwise challenged her description of the incident; nor does he make such a challenge in his appeal to us.[20] *See, e.g., United States v. Penn,* 721 F.2d 762, 766 (11th Cir.1983) (finding no abuse of discretion in trial court's admission of hearsay evidence at probation revocation hearing where defendant "d[id] not deny, and did not controvert in any way, the charge that he had had illegal drugs in his body on the specific occasions alleged" but rather sought "to rely on his asserted right to confront and cross-examine the [hearsay declarants]"); *Harris,* 612 A.2d at 202 (finding no error where court found report from drug treatment program was sufficiently reliable where "appellant never denied using illegal drugs"). In sum, Supreme Court precedent specifically contemplates that letters of this very sort will be admissible in probation hearings, and the trial court properly relied on the Mann letter in this case. *See, e.g., United States v. McCallum,* 677 F.2d 1024, 1025–26 (4th Cir. 1982) (finding letter from drug treatment provider regarding defendant's drug use to be reliable); *Reyes,* 868 N.E.2d at 442–43 (finding that hearsay statement in affidavit was reliable, given the expertise and personal knowledge of the affiant); *Commonwealth v. Calvo,* 41 Mass.App.Ct. 903, 668 N.E.2d 846, 848 (1996) (finding that sworn statement by witness with personal knowledge was substantially reliable and therefore admissible in probation revocation proceeding).[21]

The majority does not consider the propriety of the trial court's reliance on the letter. Instead, it suggests that the *Morrissey* good

cause requirement would not apply in this case because Loveall's probation was revoked due to an alleged noncriminal act in violation of a condition of probation, as opposed to an alleged commission of a crime. Maj. op. at 415 (concluding that cross-examination of probation officer is sufficient to satisfy dictates of due process in case involving alleged non-criminal act in violation of probation condition). While the majority's rationale may square conflicting court of appeals precedent, *see* maj. op. at 414–15, I agree with Justice Coats that it does not square with U.S. Supreme Court precedent, *see* conc. & dis. op. at 418.[22] In sum, while I believe Loveall's due process rights to confront witnesses required that the proffered hearsay evidence be reliable, I find that those rights are satisfied in this case.

I also take issue with the ultimate basis for the majority's ruling—namely, that a new revocation hearing is necessary in this case because Loveall was not provided with sufficient notice consistent with due process that the prosecution would introduce the Mann letter at the hearing. I agree with Justice Coats that there is no obligation that the prosecution give notice to the defendant of every piece of hearsay evidence it intends to introduce at the hearing. *See* conc. & dis. op. at 419; *Kell,* 26 F.3d at 1022–23 (holding that "in the context of parole revocation, due process does not require advance disclosure of all the information the Commission might consider as a basis for exceeding the [sentencing] guidelines," on the ground that, *inter alia,* such advance notice "would seem to

---

**20.** I would find the court's statement that it would rely on Mann's letter because the account of the incident was unchallenged by Loveall to satisfy the requirement that the court find good cause. *See Kelley,* 446 F.3d at 693 n. 4 (noting that there is a split in authority on whether an express finding of good cause is required and collecting cases).

**21.** Some jurisdictions interpret "good cause" to mean that, in addition to showing that hearsay evidence is reliable, the prosecution must show good cause for why it did not produce the witness. *See Reyes,* 868 N.E.2d at 441 (describing alternate approach); *see also id.* (declining to adopt alternate approach as too burdensome). This alternate approach is satisfied in this case because the probation hearing was held in the 18th Judicial District, whereas the events that

were the subject of the hearing in this case occurred in the 11th Judicial District. *See Commonwealth v. Durling,* 407 Mass. 108, 551 N.E.2d 1193, 1198 (1990) (finding that good cause was satisfied where defendant's probation revocation hearing was held in Norfolk County, and the events that were the subject of the hearing occurred in Bristol County, and concluding that requiring witnesses to travel to Norfolk County was a "heav[y]" burden).

**22.** The majority appears to rely on *Durling,* 551 N.E.2d at 1196, for its conclusion that the good cause need not be found. *See* maj. op. at 415 n. 8. Yet *Durling* involved an extensive analysis of when good cause exists to rely on hearsay evidence. *See, e.g.,* 551 N.E.2d at 1199 (noting that courts must assess reliability of the evidence in determining good cause).

entail an extensive pre-revocation hearing review of a parolee's file to identify all information the Commission might [consider]").[23]

Because I would reverse the court of appeals and reinstate the trial court's revocation of Loveall's probation, I respectfully dissent from that portion of the majority's opinion finding that Loveall's due process rights were violated at his probation revocation hearing.

23.  I also agree with Justice Coats, *see* conc. & dis. op. at 419, that there is no evidence in the record to support the majority's assertion that the prosecution made a "decision to withhold the names of the declarants until shortly before the hearing," maj. op. at 416.  As the record makes clear, while the probation department may have had the Mann letter and other material in its possession prior to the hearing, the prosecution did not.